

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

YURI PETRINI and
JARROD LEWIS FUSCO,
    **Plaintiffs,**
v.

KENNY GLAVAN, individually;
ANDREW "FOFO" GILICH, individually;
JERRY CREEL, individually;
CHRISTOPHER DE BACK, individually;
RICHARD WEAVER, individually;
MICHAEL WHITEHEAD, individually;
and the CITY OF BILOXI, MISSISSIPPI,
    **Defendants.**

Civil Action No. 1:21cv94 HSO-BWR

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiffs Yuri Petrini and Jarrod Lewis Fusco, proceeding pro se, file this Complaint pursuant to 42 U.S.C. §§ 1983, 1985(3), the First, Fourth, and Fourteenth Amendments to the United States Constitution, Article 3, Section 13 of the Mississippi Constitution, the Mississippi Open Meetings Act (Miss. Code Ann. § 25-41-1 *et seq.*), and Mississippi common law, and allege as follows:

### INTRODUCTION

On March 3, 2026, the Biloxi City Council silenced a citizen critic and had a journalist physically removed by the Police Chief for saying three words: "point of order." The Council then closed the doors, entered executive session, and voted to approve a raise for the very official whose conduct had been challenged. The entire sequence was captured on video.

That incident was not isolated. One week later, on or about March 10, 2026, the City's Chief Administrative Officer contacted high-level personnel at Keesler Air Force Base — where Plaintiff Fusco serves as a Master Sergeant — claiming that Fusco's activities were damaging the relationship between the City and the base, and requesting that the military take action against him. Fusco was called in by his chain of command.

This was the second time. On November 1, 2024, the City's Building Official had already emailed a U.S. Air Force official at the Mayor's direction to investigate Fusco's military status and identify his immediate supervisor.

Then, on March 31, 2026, the retaliation escalated from physical force and military intimidation to the full apparatus of the police intelligence system. After Plaintiff Petrini displayed a political painting critical of the Mayor on his own property, Defendant De Back caused the Biloxi Police Department's Criminal Intelligence Unit to issue an official CIU bulletin targeting Petrini. The bulletin — bearing the department's official seal and distributed through official law-enforcement channels to every officer in the department — contained Petrini's full Social Security number and instructed officers to "develop probable cause" against him. The City did not investigate a crime and then identify a suspect; it identified a critic and then directed its officers to manufacture a criminal case against him.

The CIU bulletin is the most documented act of retaliation in this case. It is not an off-the-record phone call or a verbal command shouted in a council chamber. It is a written government document, created through official channels, bearing the police department's institutional imprimatur, distributed to the entire force, and containing the most sensitive identifier a citizen possesses — his Social Security number — for the express purpose of targeting him for his political expression. The department's own internal recommendation states: "do not stop or detain." No reasonable law-enforcement objective justifies distributing a citizen's Social Security number to an entire police department with instructions to find something to charge him with.

The City of Biloxi is using a United States servicemember's military chain of command as a weapon, and its own criminal intelligence apparatus as a surveillance tool, to punish citizens for exercising their First Amendment rights. Four separate conspiracies — each directed or approved by the Mayor or his appointees — targeted these Plaintiffs. This lawsuit seeks to stop it.

2

## I. PARTIES, JURISDICTION, AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3)-(4). Venue is proper under 28 U.S.C. § 1391(b). Supplemental jurisdiction over state law claims lies under 28 U.S.C. § 1367.

2. Plaintiff Yuri Petrini is a resident of Harrison County, Mississippi. Petrini is a credentialed member of the Society of Professional Journalists, an investigative journalist, and the plaintiff in three pending federal civil rights actions before this Court.

3. Plaintiff Jarrod Lewis Fusco is a resident of Harrison County, Mississippi. Fusco is a Master Sergeant in the United States Air Force stationed at Keesler Air Force Base, a credentialed member of the Society of Professional Journalists, and the founder of Biloxi Politics Uncensored.

4. Defendants Kenny Glavan (Council President), Andrew "FoFo" Gilich (Mayor), Jerry Creel (Building Official), Richard Weaver (Chief Administrative Officer; retired military general officer), and Christopher De Back (Chief of Police, appointed January 20, 2026) are each sued in their individual capacities. Each acted under color of state law within the meaning of 42 U.S.C. § 1983.

5. Defendant Michael Whitehead is an attorney at Page Mannino Peresich & McDermott, PLLC, serving as defense counsel for the City of Biloxi in Cases 1:25-cv-00178, 1:25-cv-00233, and 1:25-cv-00254. As alleged in paragraphs 37 through 40 below, Whitehead provided information to law enforcement that was used to create the CIU intelligence bulletin targeting Petrini — conduct outside the scope of litigation and unprotected by litigation privilege. Whitehead acted in concert with state actors and is subject to suit under 42 U.S.C. § 1983. *Dennis v. Sparks*, 449 U.S. 24 (1980). Whitehead is sued in his individual capacity.

6. Defendant City of Biloxi, Mississippi is a municipal corporation and a "person" subject to suit under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

## II. FACTS

### A. The Stop-Work Order

7. Petrini filed Case No. 1:25-cv-00178-LG-RPM on June 6, 2025.

8. On June 30, 2025 — twenty-four days after Petrini filed his first federal lawsuit — City personnel served a stop-work order at Petrini's residence. The order was served with the assistance of two police officers.

9. At the November 7, 2025 Board of Building Adjustments and Appeals hearing, Building Official Jerry Creel testified under oath that he had "presented the information to the mayor and Pete Abide, who directed me to issue a stop work order." Creel further testified that staff serving the order was "assisted by two police officers." *See* Case No. 1:25-cv-00178-LG-RPM, ECF No. 105-2 at 51.

10. On July 9, 2025 — thirty-three days after Petrini filed his federal lawsuit — the City initiated criminal Case No. CC-51719 against Petrini. On July 10, 2025, Creel swore four affidavits alleging he personally observed Petrini at 1606 Beach Boulevard performing unpermitted work. Medical records establish that Petrini was recovering from eye surgery and was physically incapable of being present at the property on that date. The affidavits were notarized by Creel's subordinate. No explanation for this discrepancy has been provided in any of the pending federal proceedings. In related proceedings, a document purporting to be a "Standing Order to Seal" dated February 7, 2022 appeared in the case file of CC-51719 — a case that was not filed until July 9, 2025, making the document temporally impossible on its face. These allegations are the subject of pending proceedings in Case Nos. 1:25-cv-00254-LG-RPM and 1:26-cv-00069-LG-RPM.

### B. The City's Military-Channel Investigation of Fusco

11. On November 1, 2024, Building Official Jerry Creel sent an email from his City account (jcreel@biloxi.ms.us) to "MOSELEY, ROBERT T III CIV USAF AETC 81 CES/CL" (robert.moseley@us.af.mil) stating that "Mayor Gilich has asked me to check on Jarrod Lewis Fusco" and requesting whether Fusco was enlisted or contractor personnel at Keesler and, if enlisted, his immediate supervisor. Fusco received and retained a copy of that email. A true and correct copy of this email is attached hereto as Exhibit A.

### C. The March 3, 2026 City Council Meeting

12. On March 3, 2026, the Biloxi City Council held a regular public meeting at Biloxi City Hall, with Defendant Glavan presiding as Council President. The agenda included a citizen comment period and an item concerning compensation for Jerry Creel. At the outset, the Council voted to suspend its rules of order.

13. During citizen comment, Plaintiff Petrini addressed the Council in opposition to the compensation item for Jerry Creel. Petrini referred to Creel as "criminal." Glavan interrupted, stated the characterization was not appropriate, and warned Petrini he would be asked to leave. Petrini attempted to continue and also attempted to request that a copy of his recently filed state-court complaint, *Petrini v. Ready*, Case No. A2401-2026-00028 (Harrison County Circuit Court), be preserved in the Council file. Glavan interrupted and terminated Petrini's speaking turn before the request was completed. Petrini responded, "Why don't you try."

14. Glavan directed removal, stating "Will you remove him? Remove him." Mayor Gilich stated "Take them out" and "Please remove him for interrupting these proceedings."

15. Plaintiff Fusco was present in the chamber as an attendee and journalist. During the exchange, Fusco stated "point of order," as captured on plaintiffs' recordings. Defendant Gilich ordered that both Petrini and Fusco be expelled, commanding "Take them out." Police Chief De Back, acting on Gilich's verbal command, personally escorted Fusco from the chamber. The sequence occurred in open session and was captured on video.

5

16. During Fusco's removal, no City official announced a statute or ordinance violation. No citation was issued. Fusco was not booked or formally arrested. No neutral conduct rule was cited. Petrini was not physically removed but was silenced, threatened with removal, and his citizen comments were terminated.

17. The chair announced citizen comments were closed with Petrini's remarks unfinished. The Council entered executive session, returned to open session stating no action had been taken in executive session, called a resolution adjusting compensation for Jerry Creel, and approved it by a recorded 4-3 vote.

18. Other citizens who attended the meeting and did not voice opposition to City officials were not removed, not threatened with removal, and not subjected to any adverse action.

19. On March 4, 2026, the City of Biloxi posted the full March 3 meeting recording on its official YouTube channel under the title "City Council March 3 2026" (Video ID G0adfk2i9KA). Plaintiffs also maintained their own recordings.

### D. The City's Contact with Keesler Air Force Base

20. On or about March 10, 2026 — one week after the council meeting and seven days after Fusco was physically removed from the chamber — Defendant Weaver, the City's Chief Administrative Officer and a retired military general officer, contacted high-level personnel at Keesler Air Force Base regarding Plaintiff Fusco. The weight of this contact was amplified by Weaver's status as a retired military general officer with direct connections to the City's senior leadership. Upon information and belief, Weaver utilized his retired military rank and title when making this contact, thereby leveraging the authority and credibility of a general officer to pressure the active-duty chain of command of a Master Sergeant.

21. Upon information and belief, Weaver claimed that Fusco's activities were damaging the relationship between the City of Biloxi and Keesler Air Force Base, and requested that the military take action against Fusco. Fusco learned of Weaver's contact and its substance when he was called in by his chain of command to discuss the communication.

22. Following the City's contact, Fusco was called in by his military chain of command regarding the communication from the City.

23. The only activities Fusco had engaged in prior to Weaver's contact with Keesler were political speech, journalism, and attendance at a public meeting. Fusco had no other interaction with the City.

24. On March 24, 2026, Colonel Christopher J. Robinson, Commander of the 81st Training Wing at Keesler Air Force Base, issued a formal memorandum to "Master Sergeant Jarrod L. Fusco" titled "Guidance on Political Activities and Adherence to DoW and DAF Regulations." The memorandum stated that "[i]t has come to my attention that you have participated in various public forums to advocate for certain political positions" and directed Fusco to review Department of Defense Directive 1344.10, Department of the Air Force Instruction 51-508, and Air Force Instruction 1-1, and ordered that "your activities strictly conform to these directives." The memorandum was digitally signed by Colonel Robinson on March 24, 2026. A true and correct copy of this memorandum is attached hereto as Exhibit B.

25. Following the City's contact with Keesler, Colonel Robinson — the Installation Commander and special court-martial convening authority — issued the memorandum directing Fusco to conform his political activities to military regulations. No other intervening event between Weaver's contact and the Robinson memorandum has been identified.

### E. Additional Pattern Evidence

26. On December 24, 2025, Biloxi police officers were present at Petrini's residence, stopped guests leaving the property, and requested identification from a departing driver. The incident was captured on cell-phone video retained by Plaintiffs.

27. On November 7, 2025, Defendant Whitehead — opposing counsel to a pro se, unrepresented plaintiff — personally conducted surveillance of Petrini's property at 1606 Beach Boulevard at approximately 11:59 a.m., three hours before a scheduled quasi-judicial hearing at which Whitehead represented parties adverse to Petrini. Whitehead photographed the property

and emailed the photographs to senior City officials, including CAO Weaver. All surveillance occurred while a statutory stay was in effect under Biloxi Code § 23-2-4(S)(5), which provides that a pending appeal "stays all city actions" — meaning the stop-work order Whitehead was monitoring compliance with was unenforceable. This incident is documented by six timestamped photographs and Whitehead's own email admissions, and is the subject of pending proceedings in Case No. 1:25-cv-00178-LG-RPM.

28. On January 16, 2026, City staff denied services to Petrini's then-wife at the Building Department and referred her to defense counsel.

29. In January and February 2026, the City denied three-phase electrical service to Petrini's properties at 287 Bohn Street and 929 Division Street by reclassifying the use of the properties in a manner inconsistent with their existing warehouse designation, thereby preventing Petrini from obtaining the power service necessary for his warehouse operations. On February 5, 2026, Petrini filed a Notice of Appeal to the Zoning Board of Adjustments and Appeals challenging the denial. In correspondence with defense counsel dated February 3, 2026, Petrini stated his belief that the denial constituted retaliation for his investigative journalism and federal lawsuits.

30. The March 3, 2026 meeting events occurred while Petrini's three federal cases were under stay.

31. On December 19, 2025, a Biloxi resident identified as M.H. provided Plaintiffs a written report describing code-enforcement conduct at M.H.'s property that involved police presence under circumstances similar to those alleged herein.

32. The entire sequence from paragraphs 12 through 19 is captured in the City recording and can be timestamped to the second.

### F. The CIU Bulletin

33. On March 30, 2026, while the above-referenced federal cases remained pending and subject to a court-ordered stay, the City of Biloxi, through its counsel, transmitted a thirteen-trap settlement offer to Plaintiff Petrini.

34. On March 31, 2026, Plaintiff Petrini painted the words "FOFO IS A MOFO" on the exterior of his property located at 929 Division Street, Biloxi, Mississippi. The phrase referred to Mayor Andrew "Fofo" Gilich. The painting was political speech on Plaintiff's own private property, was non-commercial in nature, and required no permit under applicable law.

35. On the same date, Plaintiff Petrini published an article titled "Burger King" on his website, peoplevsbiloxi.com. Both the painted message and the article attracted immediate and widespread public attention, reaching approximately 70,000 viewers within twenty-four hours of publication.

36. Prior to painting the property, Plaintiff Petrini had informed defense counsel of his intent to paint 929 Division Street, to deploy banners at 1606 Beach Boulevard, and to paint additional properties he owns on Jim Money Road and Pass Road. Defense counsel was therefore on notice that Plaintiff intended to engage in further acts of political expression on his own properties.

37. Within approximately one hour of the painting's completion on March 31, 2026, attorney Michael Whitehead of Page Mannino, who serves as defense counsel for the City of Biloxi in the above-referenced federal litigation, arrived uninvited and without prior scheduling at 929 Division Street. Whitehead demanded that the painting be removed. Plaintiff complied.

38. Whitehead then initiated settlement discussions, both in person and by telephone throughout the remainder of the day, during which he induced statements from Plaintiff Petrini in the context of settlement negotiations. At no point during these communications did Whitehead disclose that he had contacted law enforcement or that a CIU bulletin had been issued. Through oral, written, and in-person communications, Whitehead was fully aware that Plaintiff was

scheduled to depart the country on Thursday, April 2, 2026. Whitehead subsequently reported statements made during these settlement discussions to law enforcement, omitting the settlement context in which they were induced.

39. Within hours of attorney Whitehead's visit to 929 Division Street, the Biloxi Police Department's Criminal Intelligence Unit created and issued an intelligence bulletin concerning Plaintiff Petrini. The CIU Bulletin identifies "3rd party information" as its source. No other person had contact with both Petrini and law enforcement on March 31, 2026. Whitehead is the only individual who (a) was physically present at the property, (b) heard the statement, (c) had a professional relationship with the City and its police department, and (d) had motive to report the speech to law enforcement.

40. The CIU Bulletin contained Plaintiff Petrini's Social Security number, a photograph extracted from Plaintiff's personal Facebook profile, his home address at 929 Division Street, and a physical description of his person.

41. The CIU Bulletin further contained detailed descriptions of four vehicles associated with Plaintiff Petrini, including the vehicle identification numbers and license plate numbers for each. Among the vehicles listed was a 2024 Porsche Cayenne bearing Mississippi license plate HSS02, which is registered to Plaintiff's ex-wife, Sumire Maeda, and not to Plaintiff.

42. The CIU Bulletin instructed officers of the Biloxi Police Department to "develop probable cause to initiate enforcement contact" with Plaintiff Petrini. The Department's own internal recommendation appended to the same bulletin stated: "do not stop or detain."

43. The CIU Bulletin was distributed department-wide through the Biloxi Police Department's internal electronic communications system, thereby making Plaintiff Petrini's Social Security number, home address, vehicle information, and the instruction to "develop probable cause" available to all officers within the department. A true and correct copy of the CIU Bulletin is attached hereto as Exhibit C.

44. Upon information and belief, on March 31, 2026, the Biloxi Police Department deployed twenty-four-hour surveillance at the residence of Mayor Gilich and at Biloxi City Hall.

45. Within hours of the CIU Bulletin's distribution, law enforcement personnel who recognized the bulletin as constitutionally improper provided a copy to Plaintiff Petrini in his capacity as a credentialed investigative journalist. Plaintiffs will assert applicable privileges if the identity of this source is sought in discovery.

46. Defense counsel was aware, through email correspondence and in-person communications during the settlement discussions of March 2026 and prior international communications in October 2025, that Plaintiff Petrini was scheduled to depart the United States at 5:00 a.m. on April 2, 2026 — less than forty-eight hours after the CIU Bulletin's creation — for an extended international trip lasting several weeks. The issuance of a department-wide law enforcement targeting bulletin against a person whom defense counsel knew would be out of the country within hours negates any claim that the bulletin served an officer-safety or public-safety purpose and confirms that the bulletin's sole purpose was retaliation for protected speech.

47. The foregoing events of March 30 and 31, 2026, occurred while Plaintiff Petrini was a party to three active federal lawsuits against the City of Biloxi and its officials, during a court-ordered stay of proceedings, and within hours of Plaintiff's exercise of political speech on his own property and a privileged settlement discussion with defense counsel.

48. The creation and distribution of the CIU Bulletin, the deployment of surveillance, and the instruction to officers to "develop probable cause to initiate enforcement contact" are the most recent in a series of adverse actions directed at Plaintiff Petrini, following the stop-work order (June 2025), criminal prosecution (July 2025), armed surveillance (November 2025), council silencing (March 3, 2026), and military-channel contact (March 10, 2026).

**FEDERAL CLAIMS**

### III. COUNT I: FIRST AMENDMENT — VIEWPOINT DISCRIMINATION

(Against Glavan, Gilich, and City of Biloxi)

49. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

50. The citizen comment period of a city council meeting is a designated public forum. When a government entity opens a forum for public expression, it may impose reasonable time, place, and manner restrictions, but it may not discriminate based on the viewpoint of the speaker.

51. Defendant Glavan silenced Petrini for the content and viewpoint of his speech: calling a public employee a criminal during debate on that employee's raise. Glavan cited no rule, no time limit, no procedural basis. The Council had suspended its rules of order at the outset, eliminating any content-neutral justification.

52. Defendant Gilich ordered the expulsion of both Plaintiffs — including Fusco, who stated "point of order" — because their speech was adverse to the interests of the City and its officials.

53. Plaintiffs suffered concrete and particularized injury: Petrini was denied the opportunity to complete his citizen comments on a matter of public concern; Fusco was physically removed from a public meeting by the Police Chief acting on Gilich's command. Both suffered the chilling effect of government-imposed consequences for protected political speech.

## IV. COUNT II: FIRST AMENDMENT — FREEDOM OF THE PRESS

(Against Gilich, De Back, and City of Biloxi)

54. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

55. The First Amendment protects the freedom of the press, applicable to state and municipal actors through the Fourteenth Amendment. Both Plaintiffs are credentialed members of the Society of Professional Journalists. Petrini operates peoplevsbiloxi.com, an investigative journalism platform. Fusco operates Biloxi Politics Uncensored, a political news and commentary platform. Both were present at the March 3, 2026 meeting in their capacities as journalists covering a public proceeding.

56. Defendant Gilich ordered the physical removal of a credentialed journalist from a public government proceeding. The Police Chief executed that order. Fusco was prevented from observing or reporting on the remainder of the proceedings, including the vote to approve Jerry

Creel's raise.

57. Plaintiff Fusco suffered concrete injury: physical exclusion from a public government proceeding, deprivation of the ability to observe and report on government conduct, and the chilling effect of police escort from a public forum on the Mayor's command.

## V. COUNT III: FIRST AMENDMENT — RETALIATION

(Against Glavan, Gilich, Creel, De Back, Weaver, and City of Biloxi)

58. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

59. To establish First Amendment retaliation under Section 1983, a plaintiff must demonstrate: (1) the plaintiff engaged in constitutionally protected activity; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part by the plaintiff's protected activity. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). The Supreme Court has confirmed that objective evidence of retaliatory treatment is sufficient to sustain a retaliation claim. *Gonzalez v. Trevino*, 144 S. Ct. 1663 (2024).

60. Petrini engaged in protected activity: speaking at a public meeting on a matter of public concern, filing three federal civil rights lawsuits, publishing investigative journalism about municipal corruption, and filing a state-court complaint against a municipal court judge. The adverse actions — silencing his speech, threatening removal, terminating his citizen comments, and directing a retaliatory stop-work order enforced by armed police — would deter a person of ordinary firmness from continuing to speak. The causal connection is direct: Petrini was silenced for criticizing a city official who is a defendant in his federal lawsuits, and the stop-work order was directed by the Mayor twenty-four days after the federal filing.

61. Fusco engaged in protected activity: attending a public meeting, operating a political news platform, and stating "point of order." The adverse actions against Fusco include physical removal from the council chamber by the Police Chief on Gilich's command; the November 2024 military-channel investigation in which Creel, at Gilich's direction, emailed a U.S. Air Force

13

official to identify Fusco's military status and immediate supervisor; and the March 2026 military-channel retaliation in which Weaver — a retired general officer who utilized his military rank when making the contact — contacted Keesler Air Force Base, claimed Fusco's activities were damaging the City-base relationship, and requested that the military take action against Fusco.

62. For an active-duty military member, contact from a retired general officer acting as a municipal official to military leadership requesting adverse action is among the most coercive forms of retaliation available to a government actor, threatening consequences — adverse fitness evaluations, loss of security clearance, reassignment, career termination — that no civilian faces for the same speech. The causal connection is established by escalating severity: the November 2024 email identified Fusco's chain of command; the March 3 meeting resulted in his physical removal; and one week later, the CAO contacted that chain of command to request action.

63. The CIU Bulletin of March 31, 2026 constitutes the most recent and most egregious act in this escalating pattern of retaliation. A reasonable person — confronted with the knowledge that the police department has distributed his Social Security number to every officer with instructions to "develop probable cause" — would be deterred from continuing to engage in political speech. The bulletin transforms every officer in the department into a potential instrument of retaliation and subjects Petrini to the prospect of manufactured criminal charges at every encounter with law enforcement.

64. The temporal sequence eliminates any plausible non-retaliatory explanation. The painting was displayed and the CIU Bulletin was issued on the same day. The escalation arc — from silencing speech at a council meeting (March 3), to contacting military leadership (March 10), to deploying the police intelligence apparatus with instructions to manufacture criminal charges (March 31) — reveals a continuing official policy of intimidation directed at citizens who criticize the City and its officials. *See Lozman v. City of Riviera Beach*, 585 U.S. 87, 97 (2018).

## VI. COUNT IV: FOURTEENTH AMENDMENT — EQUAL PROTECTION (CLASS OF ONE)

(Against Glavan, Gilich, and City of Biloxi)

65. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

66. The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated persons alike. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

67. Fusco was similarly situated to every other citizen and journalist present in the council chamber on March 3, 2026. Like them, he attended an open public meeting. Unlike them, he was physically removed by the Police Chief on the Mayor's command for stating three words of parliamentary procedure. No other attendee who remained silent was touched, threatened, or removed.

68. Petrini was similarly situated to every other citizen who spoke or could have spoken during citizen comments. Unlike any other speaker, Petrini was interrupted, silenced, and had his speaking turn terminated for the content of his remarks. No other citizen speaker was interrupted or silenced.

69. The differential treatment had no rational basis. No rule, statute, or ordinance was cited. The rules of order had been suspended. The sole distinguishing characteristic of Plaintiffs was the content and viewpoint of their speech — criticism of a City official.

70. The City further singled out Fusco for additional differential treatment through its military-channel contacts, targeting him specifically because of his dual status as a critic and a servicemember. No other citizen critic was subjected to contact with their employer requesting adverse action.

## VII. COUNT V: FOURTH AMENDMENT — UNREASONABLE SEIZURE

(Against De Back, Gilich, and City of Biloxi)

71. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

15

72. The Fourth Amendment prohibits unreasonable seizures of persons. A person is "seized" when, by means of physical force or show of authority, a reasonable person would not feel free to leave or to decline an officer's request. *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *Brendlin v. California*, 551 U.S. 249, 254 (2007).

73. Defendant Gilich ordered that Fusco be removed from the council chamber. Defendant De Back, the Police Chief, acting on Gilich's command, personally seized and physically escorted Fusco from the chamber. Fusco was seized within the meaning of the Fourth Amendment: he was subject to physical force and official command by the City's chief law enforcement officer, and a reasonable person would not have felt free to remain. De Back is directly liable as the officer who executed the seizure. Gilich is liable for the seizure he ordered. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

74. The seizure was unreasonable. No criminal charge was announced, no citation was issued, no arrest was made, and no neutral conduct rule was cited — because the rules had been suspended. On that record, no reasonable articulable suspicion of criminal activity existed and, to the extent the seizure was arrest-level, no probable cause existed.

75. Plaintiff Fusco suffered concrete injury: physical seizure and removal from a public forum, deprivation of bodily liberty, and the chilling of his constitutional rights.

## VIII. COUNT VI: § 1983 CONSPIRACY — THE COUNCIL MEETING

(Against Glavan, Gilich, and De Back)

76. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

77. To state a claim for conspiracy under Section 1983, a plaintiff must allege facts showing an agreement among the defendants to commit an illegal act and an actual deprivation of constitutional rights. *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994).

78. The City recording captures a single uninterrupted sequence in open session: Glavan called for removal, Gilich gave a verbal command ("Take them out"), and Defendant De Back immediately executed the command by personally escorting Fusco from the chamber. No official

announced any criminal offense, no neutral conduct rule was cited, and no independent police judgment was exercised.

79. The speed, coordination, and seamless execution of this sequence — from Glavan's verbal command to Gilich's order to De Back's physical seizure, with no intervening deliberation or legal analysis — supports a plausible inference of an on-the-spot agreement among Glavan, Gilich, and De Back to remove Fusco because of his speech during public comment, and immediate execution of that agreement. De Back's participation was not that of an uninvolved officer following routine orders; as the City's chief law enforcement officer — appointed by Gilich only six weeks earlier — De Back personally executed the seizure without exercising any independent judgment regarding probable cause, reasonable suspicion, or legal authority.

## IX. COUNT VII: § 1983 CONSPIRACY — RETALIATORY STOP-WORK ORDER

(Against Creel and Gilich)

80. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

81. As alleged in paragraphs 7 through 9, Gilich directed Creel to issue a stop-work order twenty-four days after Petrini filed his first federal lawsuit, and Creel executed it with police assistance. Creel testified under oath that he "presented the information to the mayor and Pete Abide, who directed me to issue a stop work order" — establishing that Gilich directed the enforcement action and Creel executed it pursuant to that direction. The order and its police-assisted service constitute overt acts in furtherance of an agreement between Gilich and Creel to deprive Petrini of his First Amendment rights through retaliatory enforcement action.

## X. COUNT VIII: § 1983 CONSPIRACY — MILITARY RECONNAISSANCE

(Against Creel and Gilich)

82. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

83. As alleged in paragraph 11, Creel, at Gilich's express direction, emailed a U.S. Air Force official to identify Fusco's military status and immediate supervisor. The City has no

17

regulatory, contractual, or law-enforcement relationship with Fusco's military service. Gilich directed the contact; Creel executed it; together, they gathered the intelligence that Weaver later exploited in March 2026 — constituting an agreement to deprive Fusco of his First Amendment rights through military-channel intimidation, followed by an overt act in furtherance of that agreement.

## XI. COUNT IX: § 1983 CONSPIRACY — MILITARY RETALIATION

(Against Weaver and Gilich)

84. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

85. As alleged in paragraphs 20 through 22, Weaver contacted Keesler Air Force Base, claimed Fusco's activities were damaging the City-base relationship, and requested military action against Fusco. Weaver reports directly to the Mayor. The contact required knowledge of Fusco's military status obtained through the November 2024 reconnaissance (Count VIII) and a deliberate decision to use military channels to suppress a citizen critic.

86. The Mayor is the common nexus of all four conspiracies: he directed the retaliatory stop-work order (Count VII), directed the military reconnaissance (Count VIII), commanded the council-chamber expulsion (Count VI), and his direct subordinate executed the military retaliation. Weaver's contact, at the direction and with the knowledge and approval of Gilich, constitutes an agreement to deprive Fusco of his First Amendment rights through military-channel coercion, followed by overt acts causing concrete injury.

## XII. COUNT X: MONELL MUNICIPAL LIABILITY

(Against City of Biloxi)

87. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

88. A municipality may be held liable under Section 1983 when a constitutional deprivation is caused by an official policy, a widespread custom or practice, or an act of an official with final policymaking authority. *Monell*, 436 U.S. at 694. In *Lozman v. City of Riviera*

18

*Beach*, 585 U.S. 87 (2018), the Supreme Court recognized municipal liability where city officials acted pursuant to an official plan to suppress a citizen critic at a public meeting.

89. Plaintiffs plead municipal liability on four independent grounds.

90. First, the Council's own official actions at the March 3 meeting constitute municipal policy: suspension of rules at the outset, suppression and removal directives in open session by the presiding officer and the Mayor, closure of citizen comment, and approval of the raise after all opposition was eliminated.

91. Second, the retaliatory conduct was carried out by officials with final policymaking authority. Defendant Gilich, the Mayor, directed the stop-work order, directed the military reconnaissance, and commanded the expulsion. Defendant Weaver, the Chief Administrative Officer, initiated the March 2026 military contact. These are the City's two most senior executive officials, each deploying City resources to target citizens for protected speech.

92. Third, the City has demonstrated a pattern and custom of retaliating against citizens who challenge City officials, as documented in paragraphs 7 through 45: a Mayor-directed stop-work order enforced by armed police twenty-four days after federal suit was filed; criminal prosecution thirty-three days later; military-channel investigation of Fusco's status and chain of command; police presence at Petrini's residence on December 24, 2025; denial of building services to Petrini's then-wife; silencing of speech and police removal of a journalist at a public meeting; CAO contact with Keesler Air Force Base requesting action against Fusco; a citizen report from witness M.H. alleging similar retaliatory code-enforcement conduct; and the creation and department-wide distribution of a CIU intelligence bulletin targeting Petrini for his political speech.

93. The constitutional violations were caused by official municipal action, by acts of officials with final policymaking authority, and by a demonstrated custom and pattern of retaliating against citizens who challenge City officials — including the repeated use of military-command channels to target an active-duty servicemember for his political speech.

94. Fourth, the CIU Bulletin of March 31, 2026 constitutes direct, documentary proof of official municipal policy. Unlike verbal commands or informal contacts — which may be disputed or denied — the CIU Bulletin is a written government document, bearing the department's official seal, distributed through official law-enforcement channels, and directed to every sworn officer in the department. It was issued through the formal institutional infrastructure of the Biloxi Police Department's Criminal Intelligence Unit, an arm of the municipal government. Defendant De Back, as Chief of Police, is the final policymaker for law enforcement operations within the Biloxi Police Department, and the CIU Bulletin was created and distributed under his authority. The bulletin's instruction to "develop probable cause" against a citizen critic is, on its face, an official policy to target constitutionally protected speech through the pretextual exercise of police power. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

## XIII. COUNT XI: FIRST AMENDMENT RETALIATION — CIU INTELLIGENCE BULLETIN

(Against De Back, Whitehead, and City of Biloxi)

95. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

96. Where a municipality adopts an official policy of intimidation against a citizen for his protected speech, the retaliatory character of the policy is established by its purpose and effect. *Lozman v. City of Riviera Beach*, 585 U.S. 87, 97 (2018). The Supreme Court has confirmed that retaliation claims may proceed on objective evidence that the plaintiff was singled out for retaliatory treatment. *Gonzalez v. Trevino*, 144 S. Ct. 1663 (2024).

97. Petrini engaged in constitutionally protected activity on March 31, 2026: he painted a political message on property he owns criticizing the Mayor on a matter of public concern, and he published the "Burger King" article on his journalism website. Petrini also maintained three pending federal civil rights lawsuits against the City and its officials. Each of these activities is protected under the First Amendment.

20

98. The CIU intelligence bulletin constitutes an adverse action that would deter a person of ordinary firmness from engaging in protected speech. The creation of a department-wide law enforcement intelligence dossier containing a citizen's Social Security number, home address, photograph, and vehicle information — distributed to every sworn officer in the police department with instructions to "develop probable cause to initiate enforcement contact" — is among the most severe retaliatory actions available to a municipal government short of arrest. The simultaneous deployment of 24-hour surveillance amplifies the deterrent effect beyond the bulletin itself.

99. The causal connection between protected speech and adverse action is established by same-day temporal proximity. The CIU Bulletin was created on March 31, 2026 — the identical day that Petrini painted the political message and published the article. The retaliatory motive is further corroborated by the department's own internal recommendation that officers "do not stop or detain" Petrini — a recommendation that contradicts the directive to develop probable cause and demonstrates that the bulletin served no legitimate law enforcement purpose.

100. Petrini suffered concrete and particularized injury: his Social Security number was distributed to every sworn officer in the department without his consent or knowledge; he was placed under 24-hour surveillance; an intelligence file targeting him was created and maintained within law enforcement databases; and the cumulative effect of these actions was to chill the exercise of his First Amendment rights during active federal litigation.

## XIV. COUNT XII: FOURTH AMENDMENT — PRETEXTUAL TARGETING DIRECTIVE

(Against De Back and City of Biloxi)

101. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

102. The Fourth Amendment protects the right of the people to be secure in their persons against unreasonable searches and seizures. The government may not seize a person without

specific articulable facts supporting a reasonable suspicion of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

103. The CIU Bulletin's directive to "develop probable cause to initiate enforcement contact" with Petrini inverts the constitutional framework established by the Fourth Amendment. Under the Constitution, probable cause must be established through independent observation before law enforcement may act. The directive instead begins with the target — a specific, pre-identified citizen — and instructs officers to construct a justification after the fact. This is target-first policing: select the person, then find the crime.

104. The bulletin's cataloguing of four vehicles — complete with Vehicle Identification Numbers, including the vehicle of Petrini's ex-wife who has no connection to any criminal investigation — transforms every officer in the department into a surveillance agent tasked with monitoring Petrini's movements and identifying any pretext for a stop.

105. The department's own internal recommendation — "do not stop or detain" — conclusively establishes the absence of reasonable suspicion. The City's own criminal intelligence analysts, after reviewing all available information, concluded that no basis existed for enforcement contact. The directive to develop probable cause notwithstanding that conclusion demonstrates that the targeting of Petrini was unmoored from any legitimate law enforcement objective.

106. Petrini suffered concrete and particularized injury: the issuance of a standing directive to every sworn officer to develop probable cause for enforcement contact places Petrini under continuous threat of pretextual seizure every time he operates a motor vehicle or is present at any location where a Biloxi police officer is on duty. This is not a speculative future harm — it is an active, ongoing targeting directive distributed to every officer authorized to make traffic stops and arrests within the City of Biloxi.

## XV. COUNT XIII: INFORMATIONAL PRIVACY — SSN DISTRIBUTION

(Against De Back and City of Biloxi)

22

107. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein. This claim is brought pursuant to 42 U.S.C. § 1983.

108. The Fifth Circuit recognizes a constitutional right to informational privacy consisting of two strands: one protects an individual's interest in avoiding disclosure of personal matters, and the other protects an individual's interest in making certain personal decisions free of government interference. *Fadjo v. Coon*, 633 F.2d 1172, 1175 (5th Cir. 1981). A government disclosure of personal information violates this right where (1) the individual had a legitimate expectation of privacy in the information, and (2) the individual's privacy interest outweighs the public need for disclosure. *Id.* at 1175-76.

109. A Social Security number is among the most sensitive categories of personal information an individual possesses. The Fifth Circuit has recognized that individuals have a "substantial informational privacy right to limit the disclosure of their SSNs" and that unauthorized SSN disclosure creates concrete risk of identity theft. *Sherman v. U.S. Dep't of the Army*, 244 F.3d 357 (5th Cir. 2001). Congress enacted the Privacy Act of 1974, 5 U.S.C. § 552a note, Section 7, specifically to restrict governmental use and dissemination of Social Security numbers.

110. Applying the *Fadjo* balancing test, Petrini had a legitimate expectation of privacy in his Social Security number. The public need for disclosure was nonexistent: the department's own analysts recommended that officers "do not stop or detain" Petrini, negating any claim that the SSN was necessary for officer safety or criminal identification. The inclusion of Petrini's SSN served no purpose that could not have been accomplished by the photograph, name, address, and vehicle information already contained in the bulletin.

111. Defendant De Back, through the Criminal Intelligence Unit operating under his authority, caused Petrini's Social Security number to be included in an intelligence bulletin and distributed to every sworn officer in the Biloxi Police Department. The distribution was not limited to a narrow group of investigators working a specific case. It was broadcast to the entire department. Each recipient officer now possesses Petrini's Social Security number in a permanent

23

electronic record. The City has no mechanism to recall or expunge this distribution. Unlike workplace opinions or general personal preferences, a Social Security number is the single most consequential identifier a citizen possesses — it is the key to credit, employment, tax records, and financial accounts. Its unauthorized disclosure by government actors to an entire police force constitutes a violation of the constitutional right to informational privacy under the *Fadjo* framework.

112. Petrini suffered concrete and particularized injury: the unauthorized dissemination of his Social Security number to an indeterminate number of law enforcement officers created a permanent, irrevocable risk of identity theft and financial harm; violated his constitutional right to informational privacy as recognized by the Fifth Circuit; and subjected him to the degradation of having his most sensitive personal identifier distributed as part of a targeting dossier.

## XVI. COUNT XIV: PRIOR RESTRAINT — SUPPRESSION OF ANNOUNCED SPEECH

(Against De Back, Whitehead, and City of Biloxi)

113. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

114. The First Amendment's prohibition on prior restraints is among the most settled principles in constitutional law. *Near v. Minnesota*, 283 U.S. 697 (1931). Where the government deploys an extrajudicial enforcement apparatus to suppress speech before it occurs — without judicial process, without an injunction, and without a content-neutral regulatory scheme — that apparatus functions as an unconstitutional prior restraint.

115. As alleged in paragraph 36, Petrini informed defense counsel of his intent to paint political messages on multiple properties he owns within the City of Biloxi, including 929 Division Street, 1606 Beach Boulevard, and properties on Jim Money Road and Pass Road. On March 31, 2026 — the day Petrini painted the first such message — the City responded not with an injunction sought through judicial process, not with a content-neutral ordinance regulating signage, but with a Criminal Intelligence Unit bulletin distributed to every sworn officer in the

department and the deployment of 24-hour surveillance.

116. The CIU Bulletin and accompanying surveillance are not merely subsequent punishment for the March 31 painting — they are a prospective mechanism designed to deter and prevent future speech. The bulletin's directive to "develop probable cause to initiate enforcement contact" is not retrospective; it is an ongoing, forward-looking instruction that remains in force for every officer in the department. Together with 24-hour surveillance, they constitute an informal but unmistakable system of censorship targeting future political expression. The government did not seek a court order, did not petition for an injunction, and did not invoke any judicial process whatsoever.

117. Petrini suffered concrete and particularized injury: the CIU Bulletin and 24-hour surveillance have operated to chill and deter his announced plans to paint political messages on additional properties; the knowledge that every sworn officer in the department has been instructed to develop grounds for enforcement contact creates a continuous deterrent effect on future speech; and the absence of any judicial process deprives Petrini of the procedural safeguards the First Amendment requires before speech may be restrained.

---

## STATE CLAIMS

## XVII. COUNT XV: MISSISSIPPI OPEN MEETINGS ACT VIOLATION

(Against Glavan, Gilich, De Back, and City of Biloxi)

118. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

119. The Mississippi Open Meetings Act declares that "all official meetings of any public body ... shall be open to the public at all times." Miss. Code Ann. § 25-41-5. The Act permits a public body to adopt "reasonable rules and regulations" governing conduct of persons attending meetings. Miss. Code Ann. § 25-41-9.

120. Defendants expelled Plaintiff Fusco from the open portion of a City Council meeting without citing any reasonable rule or regulation, without identifying any violation of law, and without any process. Defendants thereby violated the mandate of § 25-41-5.

121. The suspension of the Council's own rules of order did not create authority for ad hoc, viewpoint-based exclusion. To the contrary, removing procedural rules while retaining the power to expel created unbounded executive discretion incompatible with the Open Meetings Act.

122. The closure of citizen comments while Petrini's remarks remained unfinished, followed by immediate entry into executive session, further frustrated the Act's purpose of ensuring public access to government deliberation.

## XVIII. COUNT XVI: MISSISSIPPI CONSTITUTION — FREEDOM OF SPEECH AND PRESS

(Against Glavan, Gilich, Weaver, and City of Biloxi)

123. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

124. The Mississippi Constitution provides: "The freedom of speech and of the press shall be held sacred." Miss. Const. art. 3, § 13.

125. Mississippi courts have recognized that Article 3, Section 13 may afford broader speech protections than the federal First Amendment. Plaintiffs invoke these protections as an independent and supplemental basis for relief for the acts of viewpoint-based suppression, journalist exclusion, and military-channel retaliation pleaded herein.

## XIX. COUNT XVII: FALSE IMPRISONMENT

(Against De Back and Gilich, in their individual capacities)

126. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

127. Under Mississippi law, false imprisonment consists of the restraint of a person's liberty without legal authority. Defendant Gilich ordered the physical removal of Plaintiff Fusco from the council chamber. Defendant De Back, the Police Chief, acting on Gilich's verbal command, personally seized and escorted Fusco from the chamber. Fusco was restrained in his liberty of movement and compelled to leave a public proceeding by force.

128. The restraint was without legal authority. No criminal offense was cited, no arrest warrant existed, no citation was issued, no neutral conduct rule was violated, and no probable cause or reasonable suspicion existed. Fusco stated three words of parliamentary procedure.

129. Fusco suffered injury: deprivation of bodily liberty, humiliation, and the loss of his right to be present at a public government proceeding. Gilich is liable as the official who ordered the false imprisonment. De Back is liable as the officer who personally executed it.

## XX. COUNT XVIII: TORTIOUS INTERFERENCE WITH EMPLOYMENT

(Against Weaver, Creel, and Gilich, in their individual capacities)

130. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

131. Under Mississippi law, tortious interference with business or employment relations requires intentional and willful acts calculated to cause damage to the plaintiff in his lawful business or employment, done with the unlawful purpose of causing damage or loss without right or justifiable cause, and resulting in actual damage and loss.

132. Fusco is employed by the United States Air Force as a Master Sergeant stationed at Keesler Air Force Base. This employment relationship is a protected business relationship under Mississippi law.

133. As alleged in paragraphs 11 and 20 through 25, Weaver contacted Keesler requesting military action against Fusco, and Creel initiated the November 2024 inquiry identifying Fusco's status and chain of command. These contacts were calculated to cause damage to Fusco's military employment, were made without right or justifiable cause — the City has no regulatory or

27

law-enforcement relationship with Fusco's military service — and Fusco's political activities are constitutionally protected. Fusco suffered actual damage: he was called in by his chain of command, subjected to institutional scrutiny, and placed under threat of adverse career consequences.

## XXI. COUNT XIX: DEFAMATION PER SE

(Against Weaver, in his individual capacity)

134. Plaintiffs reallege and incorporate paragraphs 1 through 48 as if fully set forth herein.

135. Under Mississippi law, a statement is defamatory per se if it tends to injure the plaintiff in his profession, trade, or business. Defamation per se does not require proof of special damages.

136. Defendant Weaver communicated to high-level military personnel at Keesler Air Force Base that Fusco's activities were "damaging" the City-base relationship and requested military action against Fusco. These statements were false — Fusco's activities consist of constitutionally protected political speech, journalism, and civic participation — and were published to third parties.

137. The statements tend to injure Fusco in his military profession by portraying him as a servicemember whose off-duty conduct damages important institutional relationships, warranting command intervention. Weaver made the statements with knowledge of their falsity or reckless disregard for their truth, given that the activities at issue are manifestly lawful. Fusco suffered damages: he was called in by his chain of command, subjected to scrutiny of his civilian political activities, and placed under threat of adverse career consequences.

## XXII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that this Court **GRANT** the following relief:

(a) Declare that Defendants violated Plaintiffs' rights under the **First Amendment** through viewpoint discrimination, exclusion of a credentialed journalist, retaliation for protected speech — including the use of **military-command channels** to target an active-duty servicemember and the deployment of the **Criminal Intelligence Unit** to target a citizen critic;

(b) Declare that the CIU Bulletin of March 31, 2026 violated the **First Amendment** by directing officers to "develop probable cause" against Plaintiff Petrini in retaliation for his protected political expression, and violated the **Fourth Amendment** by facilitating pretextual investigation and surveillance without probable cause;

(c) Declare that Defendants violated the **Fourteenth Amendment** through class-of-one differential treatment;

(d) Declare that Defendants violated the **Fourth Amendment** by unreasonably seizing Plaintiff Fusco without probable cause or reasonable suspicion;

(e) Declare that Defendants engaged in **four § 1983 conspiracies** to deprive Plaintiffs of their constitutional rights, as pleaded in Counts VI through IX;

(f) Declare that Defendants violated the **Mississippi Open Meetings Act** and **Mississippi Constitution, Article 3, Section 13**;

(g) Declare that the CIU Bulletin and its directive to "develop probable cause to initiate enforcement contact" constitute an unconstitutional **prior restraint** on Plaintiff Petrini's announced political speech;

(h) Permanently **enjoin** Defendants and their agents from contacting the United States Air Force, the Department of Defense, Keesler Air Force Base, or any military chain of command regarding Plaintiff Fusco's political speech, journalism, or civic participation;

(i) Permanently **enjoin** Defendants and their agents from issuing, distributing, or maintaining any CIU bulletin, intelligence report, or law-enforcement communication targeting Plaintiffs for their political speech, journalism, or civic participation;

(j) **Order** the City of Biloxi to **destroy** all copies of the CIU Bulletin of March 31, 2026, including all electronic copies in the department's internal systems, and to certify under oath that

29

destruction is complete;

(k) **Order** the City of Biloxi to **expunge** Plaintiff Petrini's Social Security number from all law enforcement databases, intelligence files, and internal records in which it was disseminated as a result of the CIU Bulletin;

(l) **Order** the City of Biloxi to **recall** in writing the directive to "develop probable cause to initiate enforcement contact" with Plaintiff Petrini and to instruct all officers that no such directive is in effect;

(m) Declare that the City of Biloxi maintained **unconstitutional policies, customs, and practices** — including the use of military channels to suppress critics and the deployment of the Criminal Intelligence Unit against political opponents — giving rise to **municipal liability** under *Monell v. Department of Social Services*, 436 U.S. 658 (1978);

(n) Award **nominal damages** to each Plaintiff for each proven constitutional violation;

(o) Award **compensatory damages** to each Plaintiff against each Defendant, jointly and severally;

(p) Award **punitive damages** against Defendants Glavan, Gilich, Creel, De Back, Weaver, and Whitehead in their individual capacities;

(q) Award reasonable **attorney fees** and costs pursuant to 42 U.S.C. § 1988;

(r) Award pre- and post-judgment **interest** as permitted by law; and

(s) Award such other and further relief as this Court deems just and proper.

## XXIII. JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38.

Respectfully submitted this \_\_\_\_ day of _____, 2026.

*/s/ Yuri Petrini*
**YURI PETRINI**
Plaintiff, Pro Se
929 Division Street
Biloxi, MS 39530
Telephone: (305) 504-1323
Email: contact@peoplevsbiloxi.com
Email: yvpetrin@my.loyno.edu

*/s/ Jarrod Lewis Fusco*
**JARROD LEWIS FUSCO**
Plaintiff, Pro Se
435 Cove Dr
Biloxi, MS 39531
Telephone: (702) 375-8926
Email: milesapartjf@gmail.com